**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**DEBRA E.,**

                    **Plaintiff,**

**v.**                                                              **6:18-CV-00513 (NAM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**

---

**Appearances:**

Peter W. Antonowicz
Office of Peter W. Antonowicz
148 West Dominick Street
Rome, New York 13440
*Counsel for Plaintiff*

June L. Byun
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Counsel for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

        Plaintiff Debra E. filed this action under 42 U.S.C. § 405(g), challenging the denial of

her application for Supplemental Security Income ("SSI") under the Social Security Act ("the

Act"). (Dkt. No. 1). The parties' briefs are presently before the Court. (Dkt. Nos. 10, 11).

After carefully reviewing the administrative record, (Dkt. No. 8), the Court affirms the denial

decision.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff applied for disability benefits in February 2015, alleging that she had been disabled since January 7, 2014.  (R. 12).  Plaintiff alleged that her disability was caused by degenerative disc disease, arthritis, bulging/herniated discs, vertigo, sciatica, depression, and anxiety.  (R. 177).  The Social Security Administration ("SSA") denied Plaintiff's application on July 7, 2015.  (*See* R. 60–67).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (*See* R. 68–70).  The hearing was held on May 10, 2017 before ALJ Jeremy G. Eldred, and Plaintiff was represented by counsel.  (R. 26–46).  On June 15, 2017, the ALJ issued a decision finding that Plaintiff was not disabled under the Act.  (R. 12–21).  Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1–3).  Plaintiff commenced this action on April 27, 2018.  (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1970.  (R. 31).  She graduated from high school and attended one year of college.  (R. 248).  She worked as a Certified Nurse Assistant ("CNA") from 2013 to 2014.  (R. 55, 178).  Prior to her work as a CNA, Plaintiff worked as a personal care assistant (2012–2013), and as a "skiptrace representative" for a loan company checking credit reports and researching phone numbers and addresses (1992–2012).  (*Id.*).  Plaintiff testified that she stopped working because of her medical conditions.  (R. 177).  She has not worked since January 7, 2014.  (*Id.*).

Plaintiff testified that she suffered from a herniated disc, sciatica, arthritis, degenerative joint disease, headaches, and spinal stenosis.  (R. 34).  Plaintiff stated that her conditions cause pain and muscle spasms in her mid and lower back, and that she gets headaches that can last

two to four days.  (R. 34–35).  Plaintiff stated that she is unable to get much sleep and is "exhausted on a daily basis."  (R. 36).  Plaintiff was treating her conditions with medications and home exercises.  (R. 35).  Plaintiff stated that she is in pain every day, and experiences leg twitches, charley horses, back pain, and arthritis.  (R. 201).  Plaintiff reported that it "hurts to stand too long," that she is unable to sit for more than 10 to 20 minutes at a time, that she "can't walk [ ] far without pain," and that she can only lift up to 20 pounds.  (R. 197–98).

Plaintiff lives with her husband and two daughters.  (R. 427).  Plaintiff stated that her daily routine includes driving her husband to and from work, and completing household chores if she is able.  (R. 37).  Plaintiff reported cooking simple meals four to five times a week, doing laundry three times a week, and cleaning the house two to three times weekly.  (R. 427).  Plaintiff reported that she spends her time watching television, playing on the computer, listening to the radio, reading, and going to her kids' sports games and school events.  (R. 196, 427, 433).  Plaintiff's conditions have not changed her ability to manage her finances, pay bills, count change, or handle a savings account.  (R. 196).  Plaintiff reported that she "cannot drive long distances unless necessary," because it "bothers [her] back to sit that long in [a] car."  (*Id*.).  Plaintiff reported no problems getting along with family, friends, and neighbors.  (R. 197).

With regard to personal care, Plaintiff is able to dress, bathe, and groom herself.  (R. 433).  Plaintiff reported showering three times a week, but noted that "washing her backside is hard."  (R. 427).  She stated that she dresses herself seven times a week.  (*Id*.).  Plaintiff reported having difficulty shaving her legs and clipping her toenails because bending down hurts her back.  (R. 194).

## C. Medical Evidence of Disability

Plaintiff's disability claim stems from conditions including degenerative disc disease, arthritis, bulging/herniated discs, vertigo, sciatica, depression, and anxiety. (R. 177). Plaintiff claims that she has struggled with these conditions since 2014 and has received treatment from a number of medical providers.

### 1. Laura Surman, Nurse Practitioner

On January 2, 2013, Plaintiff presented to Nurse Practitioner ("NP") Laura Surman complaining of stiffness and back pain. (R. 421–25). NP Surman ordered Plaintiff to begin physical therapy, complete at-home exercises, and apply heat and massage therapy as needed. (R. 425). At a follow-up appointment, NP Surman ordered X-rays for Plaintiff's lumbar spine, which showed "minor degenerative changes." (R. 415–20).

In December 2013, Plaintiff presented to NP Surman with continued back pain and pain "shoot[ing] down her left leg." (R. 410). Plaintiff noted that the pain was aggravated by prolonged sitting and standing. (*Id.*). NP Surman ordered a Depo-Medrol Injection and an MRI. (R. 414). Plaintiff's MRI results showed a left lateral L5-S1 protrusion (herniated disc) that was "producing compression on the left S1 nerve root sleeve." (R. 409). There was also a "diffuse disc bulging at L4-5 with bilateral facet hypertrophy," and "marked degenerative facet hypertrophy at L3-4" with "minimal bulging." (*Id.*). NP Surman encouraged Plaintiff to continue with physical therapy and consult with a pain clinic for further treatment. (R. 407).

At follow-up appointments from 2014 through 2017, NP Surman frequently encouraged Plaintiff to adjust her diet, exercise regularly, attend physical therapy, and to complete the home exercises as directed by her providers. (*See* R. 357–425, 438–547). Throughout that period, Plaintiff generally reported her back pain level as two to four out of ten. (*See* R. 357, 363, 390,

4

404). In August 2014, NP Surman recommended that Plaintiff see a neurosurgeon to assist with her plan of care. (R. 381). NP Surman's office notes from March 2017 indicate that a neurosurgeon determined that Plaintiff was "not [a] candidate" for surgery. (R. 509).

In August 2016, NP Surman completed a Medical Source Statement (co-signed by Dr. Bruce Elwell), which found that: (1) Plaintiff could occasionally carry and lift 20 pounds, and frequently carry and lift 10 pounds; (2) Plaintiff could walk and stand for 20 minutes without a break, stand and walk for 1 hour of an 8 hour day, sit for 20 minutes at a time, and sit for a total of 1 hour in an 8 hour day; (3) Plaintiff would need to lay down intermittently throughout the day with unpredictable frequency; and (4) that Plaintiff's health conditions would likely cause her to be absent from work "[a]bout four days per month." (R. 505–506).

### 2. Physical Therapy Treatment

In January 2013, Plaintiff presented to Physical Therapists Brittany Wolanin and Shane Davis for treatment of her back pain. (R. 352). Plaintiff saw Wolanin and Davis for a number of therapy appointments, after which Plaintiff reported some improvement in her pain symptoms. (R. 351). Davis noted a "12 point improvement in Plaintiff's back index score demonstrating good functional progress." (R. 350). Davis discharged Plaintiff from physical therapy in February 2013 after her "progress had plateaued," and transitioned her to independent management of her pain symptoms. (R. 349).

Plaintiff returned to physical therapy with Davis in January 2014. (R. 269). Plaintiff reported continued left sided lower back pain and leg pain. (*Id.*). Plaintiff reported that the pain was a three or four out of ten. (*Id.*). Davis noted that Plaintiff had a moderate to significant limitation with walking, washing, dressing, sleeping, and prolonged standing. (*Id.*). Davis assessed that Plaintiff had "good" rehabilitation potential and developed a plan of care that

included therapeutic exercises, manual massage therapy, patient education, and electrostimulation. (R. 272–74). Davis's treatment records show that Plaintiff made some progress with treatment. (*See generally* R. 277–333). In April 2014, Davis reported that "[Plaintiff] was able to complete her full program with no episodes of increased pain," but noted that "progress with [Plaintiff] has plateaued at this time with [range of motion], strength, and function." (R. 324–27). Davis discharged Plaintiff to a "step down" program. (R. 327).

### 3. Dr. Jacqueline Santoro, Consultative Examiner

In June 2015, Plaintiff presented to Dr. Santoro for a consultative psychiatric examination. (R. 431–34). Dr. Santoro observed that Plaintiff's "demeanor and responsiveness to questions was cooperative," and her "[m]anner of relating was adequate." (R. 432). She noted that Plaintiff's posture was normal, but her "motor behavior was restless." (*Id.*). Plaintiff told Dr. Santoro that she "was in discomfort" during the exam. (*Id.*). Dr. Santoro assessed that Plaintiff has no limitations with regard to following and understanding simple directions, performing simple tasks, and maintaining attention and concentration. (R. 433). She noted that Plaintiff had mild limitations to maintaining a regular schedule, learning new tasks, performing complex tasks, making appropriate decisions, relating with others, and dealing with stress. (*Id.*). Dr. Santoro opined that although the "results of the [ ] evaluation appear to be consistent with psychiatric problems," any limitations caused by those issues were "insufficient to interfere with her ability to function on a daily basis." (*Id.*). Dr. Santoro diagnosed Plaintiff with "unspecified depressive disorder," and noted that her prognosis was "[f]air, given her history of health issues." (R. 434).

### 4. Dr. Justine Magurno, Consultative Examiner

Plaintiff reported for a consultative physical examination by Dr. Magurno in June 2015. (R. 426–30). Plaintiff reported that she had low back pain related to herniated discs at L5-S1 and middle back pain related to arthritis. (R. 426). Plaintiff stated that her lower back hurts most of the time, and ranges from a four to five out of ten. (*Id.*). Plaintiff explained that her pain improves when she sits and rests. (*Id.*). Plaintiff reported that she also suffers from vertigo and carpal tunnel syndrome. (*Id.*). Dr. Magurno observed that Plaintiff had normal gait, but "appeared to be in mild distress." (R. 428). Plaintiff could walk on heels and toes with no difficulty and could do a half squat. (*Id.*). Plaintiff did not need help changing for the exam, and was able to get onto the exam table by herself. (*Id.*). Plaintiff needed assistance getting off the table. (*Id.*). Plaintiff could rise from a chair with moderate difficulty. (*Id.*). Dr. Magurno assessed that Plaintiff had full rotary movement bilaterally and had a negative straight leg raise bilaterally. (*Id.*). She found that Plaintiff had full strength in her upper extremities, and her right lower extremity. (R. 429). Plaintiff had "4/5 left knee flexion" and "4/5 left toe extension." (*Id.*).

Dr. Magurno determined that Plaintiff's prognosis was fair, and diagnosed Plaintiff with low back pain due to herniated discs, arthritis, vertigo, and carpal tunnel syndrome. (R. 429). She assessed that Plaintiff had moderate limitations to squatting, lifting, and carrying, along with a moderate to marked limitation for bending. (*Id.*). Dr. Magurno found that Plaintiff had mild limitations for reaching and pulling. (*Id.*). She noted that Plaintiff should avoid heights and ladders. (*Id.*).

**D. ALJ's Decision Denying Benefits**

On June 15, 2017, ALJ Eldred issued a decision denying Plaintiff's application for disability benefits. (R. 12–21). At step one of the five-step sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 9, 2015. (R. 14).

At step two, the ALJ determined that, under 20 C.F.R. § 416.920(c), Plaintiff had three "severe" impairments: degenerative disc disease of the lumbar spine, mild degenerative joint disease in the knees, and obesity. (*Id.*). Specifically, the ALJ noted that MRI results of Plaintiff's lumbar spine showed degenerative disc disease, a disc herniation at L5-S1, a disc protrusion with facet disease, and mild to moderate stenosis. (*Id.*). X-rays of Plaintiff's knees showed "mild degenerative changes and slight effusion in both knees." (*Id.*). The ALJ noted that Plaintiff was obese. (*Id.*). The ALJ found that Plaintiff's carpal tunnel syndrome, vertigo, headaches, and anxiety were not severe impairments. (R. 15–17).

At step three, the ALJ determined that, while severe, Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) (the "Listings"). (R. 17). The ALJ concluded that "[t]he severity of [Plaintiff's] physical impairments, considered singly and in combination, does not meet or medically equal the criteria of any impairment listed in Appendix 1, including listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine)." (*Id.*).

At step four, the ALJ determined that Plaintiff "has the residual functional capacity to perform the full range of sedentary work, as defined in 20 C.F.R. § 416.967(a)."[1] (R. 17). In

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.

support of that determination, the ALJ observed that "[Plaintiff's] back and knee impairments, considered in combination with her obesity, would be expected to cause some limitations for standing and walking, but not limitations as severe as those alleged by [Plaintiff]." (R. 18). The ALJ found that "the clinical findings do not suggest that the claimant would be unable to stand or walk for at least two hours in an eight-hour day or unable to lift or carry at least ten pounds, as required in sedentary exertional work." (*Id*.). The ALJ noted that Plaintiff "had somewhat limited range of motion of her lumbar spine and hips," but had "no sensory or strength deficits in her lower extremities." (*Id*.).

The ALJ found that Plaintiff's medications reduced her pain, and that her physical therapy records indicate that her back symptoms improved with treatment. (R. 19). The ALJ concluded that "[Plaintiff's] conservative treatment and response to treatment suggest that her back condition is not as severe as she alleges." (*Id*.). The ALJ also noted that Plaintiff's activities of daily living included driving her husband and children to work and school, cooking meals four to five times per week, cleaning, regular shopping, and personal grooming and bathing. (*Id*.).

The ALJ gave partial weight to Dr. Magurno's opinion that Plaintiff had mild limitations to reaching, pulling, and pushing, moderate limitations to squatting, lifting, and carrying, and moderate to marked limitations to bending. (*Id*.). The ALJ stated that "Dr. Magurno's description of the claimant's limitations does not suggest that the claimant would be unable to perform sedentary work." (*Id*.).

The ALJ gave little weight to Dr. Elwell's opinions (including his co-signed Medical Source Statement completed by NP Surman) that Plaintiff had severe limitations to sitting and

---

Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a).

standing in any combination for a full work day.  (R. 19–20).  The ALJ noted that these

conclusions were "not consistent with the evidence as a whole," and that "[Plaintiff's] reported

activities of daily living demonstrate that she is not as limited as Dr. Elwell's opinion suggests."

(R. 20).  The ALJ also found that the providers' recommendations that Plaintiff swim and

exercise more regularly were "not consistent" with the highly restrictive Medical Source

Statement.  (*Id.*).

The ALJ stated that Plaintiff's RFC "is supported by Dr. Magurno's opinion, the clinical

findings during the consultative examination, the claimant's treatment history, and the

claimant's reported activities of daily living, all of which suggest that she retains the ability to

meet the exertional demand of at least sedentary work on a sustained basis."  (*Id.*).

Finally, at step five, the ALJ found that Plaintiff "is capable of performing her past

relevant work as a skip trace representative."  (R. 20).  The ALJ noted that Plaintiff "testified

that this job required her to sit at a desk, run credit reports, and research phone numbers and

addresses."  (*Id.*).  Alternatively, the ALJ concluded that "there are other jobs existing in the

national economy that [Plaintiff] is also able to perform," citing the testimony of the vocational

expert that an individual with her limitations would be able to perform the requirements of

sedentary occupations such as a "document preparer" or "addresser."  (*Id.*).  Therefore, the ALJ

determined that Plaintiff was not disabled because she was capable of making a successful

adjustment to other work that exists in significant numbers in the national economy.  (R. 20–

21).

## III.  DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step sequential process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 416.920.  The Regulations define residual functional capacity ("RFC") as "the most [a claimant] can still do despite your limitations."  20 C.F.R. § 416.945(a)(1).  In assessing the RFC of a claimant with multiple impairments, the SSA

11

considers all "medically determinable impairments," including impairments that are not severe. *Id*. § 416.945(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

## B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id*. at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive

12

effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## C. Analysis

Plaintiff asserts two arguments challenging the Commissioner's denial decision. (Dkt. No. 10). Specifically, Plaintiff contends that the ALJ erred by: (1) improperly evaluating the severity of Plaintiff's impairments under Listing 1.04; and (2) giving inappropriate weight to certain opinion evidence resulting in an inaccurate RFC. (*Id.*, pp. 9–12). The Court will address each argument in turn.

### 1. Assessment of Plaintiff's Listing Impairments

First, Plaintiff argues that "the ALJ mischaracterized the severity of the claimant's spine conditions," and "failed to acknowledge the presence of findings, particularly compromise of the S1 nerve root, that are specifically mentioned in listing 1.04." (*See* Dkt. No. 10, pp. 9–10). Plaintiff states that this error prevented the ALJ from "properly consider[ing] whether claimant's medical condition met or equaled the [Listing]." (*Id.*). In response, the Commissioner argues "the ALJ properly found that Plaintiff's lumbar spine impairment did not meet or medically equal the criteria of Listing 1.04 and his finding is supported by substantial evidence." (*See* Dkt. No. 11, pp. 7–9). At the third step in the five-step sequential analysis, an ALJ may find that a claimant has shown that her impairment matches a listing only if the impairment "meet[s] *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* The Listings "describe[ ] for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work

13

experience." 20 C.F.R. § 416.925(a).  Listing 1.04 relates to "Disorders of the spine (e.g.,

herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative

disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root

(including the cauda equina) or the spinal cord."  20 C.F.R. Part 404, Subpart P, Appendix 1, §

1.04 ("Listing 1.04").  In addition, the claimant must satisfy one of three criteria: (A) evidence

of nerve root compression; (B) spinal arachnoiditis; and (C) lumbar spinal stenosis resulting in

pseudoclaudication.  *Id.*  Although Plaintiff does not specify which of the criteria she believes

she satisfies, her argument focuses on the existence of positive straight leg raise tests and nerve

root compression, which are only required under Listing 1.04(A).  That section mandates that

the claimant must show each of the following:

> (1) Evidence of nerve root compression characterized by neuro-
> anatomic distribution of pain, (2) limitation of motion of the spine,
> (3) motor loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss and, (4) if there is
> involvement of the lower back, positive straight-leg raising test
> (sitting and supine).

*Id.*, § 1.04(A).  To meet these requirements, a claimant "must offer medical findings equal in

severity to all requirements, which [ ] must be supported by medically acceptable clinical and

laboratory diagnostic techniques."  *Knight v. Astrue*, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012)

(citing 20 C.F.R. § 416.926(b)).  Thus, the claimant bears the burden of proving that her

impairments meet the particular Listing.  *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)

(explaining that the burden shifts to the Commissioner at step five, after "the claimant satisfies

her burden of proving the requirements in the first four steps").

An ALJ is not required, in every instance, to provide an express explanation for his

conclusion that a claimant's impairments fail to meet or equal the requirements of a Listing.

*See Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 (S.D.N.Y. 2014) (citing *Berry v. Schweiker*, 675

F.2d 464, 469 (2d Cir. 1982)).  "[W]here the evidence on the issue of whether a claimant meets

or equals the listing requirements is equipoise and 'credibility determinations and inference

drawing is required of the ALJ' to form his conclusion at step 3, the ALJ must explain his

reasoning." *Id*. (quoting *Berry*, 675 F.2d at 469).  Although "an ALJ 'should set forth a

sufficient rationale in support of his decision to find or not to find a listed impairment,' the

absence of an express rationale for an ALJ's conclusions does not prevent [the court] from

upholding them so long as [the court] is 'able to look to other portions of the ALJ's decision and

to clearly credible evidence in finding that his determination was supported by substantial

evidence.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting

*Berry*, 675 F.2d at 469).

In support of her contention that her back condition meets Listing 1.04, Plaintiff points

to MRI evidence showing that she has a herniated disc with nerve compression.  (*See* Dkt. No.

10, p. 9).  Plaintiff alleges that the ALJ's failure to acknowledge this demonstrates a failure to

"engage[] in a proper evaluation of the listed impairment."  (*Id*., pp. 9–10).  In response, the

Commissioner argues that Plaintiff cannot show that Listing 1.04(A) was met because Plaintiff

did not have motor loss or sensory or reflex loss.  (Dkt. No. 11, p. 8).  The Commissioner adds

that Plaintiff also cannot show that Listings 1.04(B) or 1.04(C) were met because there were no

clinical findings during the relevant period showing evidence of spinal arachnoidids, lumbar

spinal stenosis resulting in pseudoclaudication, or an inability to ambulate.  (*Id*.).

As the Commissioner notes, the burden is on Plaintiff to show that *all* of the

requirements are met before she can satisfy a Listing.  Here, the Court finds that there is no

medical evidence of "motor loss accompanied by sensory or reflex loss," as required by Listing

1.04(A).  Notably, the record shows that NP Surman frequently observed that Plaintiff had

"steady unassisted gait," and "normal sensation, reflexes, coordination, muscle strength and tone." (*See, e.g.*, R. 366, 371, 380, 387, 393, 413, 419, 449, 513, 522). The record also contains at least two instances where Plaintiff's straight leg raise tests were negative, including one performed by her own treating provider. (*See, e.g.*, R. 346, 428). Plaintiff also frequently denied muscle weakness and loss of strength. (*See, e.g.*, R. 365, 383, 392, 397, 500, 535). Consultative Examiner Dr. Magurno found that Plaintiff walked with a normal gait, did not need help changing for the examination, and was able to get onto the examination table by herself. (R. 428). Dr. Magurno also noted that Plaintiff had no sensory deficit, and had full strength in her upper extremities and right lower extremity. (R. 429). As to the left lower extremity, Plaintiff exhibited 4/5 left knee and 4/5 left toe flexion. (*Id.*). In light of this evidence, the Court finds that the ALJ could reasonably conclude that Plaintiff did not meet the criteria of Listing 1.04(A). Moreover, the Court finds no evidence, nor does Plaintiff argue, that her condition met the requirements of Listings 1.04(B) or 1.04(C).

Accordingly, Plaintiff has failed to show that the ALJ erred in concluding that Plaintiff did not meet or equal the impairment criteria for Listing 1.04. *See Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 889 (2d Cir. 2007) (noting that it was the plaintiff's "burden to demonstrate that her disability met all of the specified medical criteria of a spinal disorder" and upholding the ALJ's decision that the plaintiff's impairments did not meet or equal Listing 1.04(A) because there was no evidence of motor loss accompanied by sensory or reflex loss or of nerve root compression); *Conetta v. Berryhill*, 365 F. Supp. 3d 383, 396–98 (S.D.N.Y. 2019) (finding that Plaintiff failed to show she met Listing 1.04 where there was insufficient medical evidence to show that she met *all* of the criteria); *Kelsey v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 437, 444 (W.D.N.Y. 2018) (affirming the ALJ's finding that Listing 1.04 criteria were not met

because "Plaintiff's motor strength was consistently normal with no evidence of atrophy, as were her sensation and deep-tendon reflexes").

## 2. Evaluation of the Medical Evidence

Second, Plaintiff argues that the ALJ erred in failing to properly assess and weigh the medical evidence when determining the Plaintiff's RFC. (Dkt. No. 10, pp. 10–12). Specifically, Plaintiff alleges that the ALJ's conclusion that Plaintiff could perform a "full range of sedentary work" is at odds with the opinions from Plaintiff's treating providers, NP Surman and Dr. Elwell. (*Id.*). Plaintiff contends that the limitations identified by Plaintiff's treating providers "are entirely consistent with the objective evidence with regard to the injuries to plaintiff's spine." (*Id.*, p. 11). In response, the Commissioner argues that the ALJ "properly exercised his discretion in resolving the evidentiary conflicts . . . and assessed an RFC that is supported by substantial evidence." (Dkt. No. 11, pp. 10–11). The Commissioner states that "[t]he ALJ carefully considered all of the evidence of record, including treatment records, opinion evidence by Dr. Elwell [and NP Surman,] consultative examiner Dr. Magurno, and Plaintiff's broad range of activities." (*Id.*, p. 12). The Commissioner also contends that "Dr. Elwell's opinion was inconsistent with the clinical findings by the consultative examiner," and that the results of a consultative examination "may provide substantial evidence that a claimant is not disabled." (*Id.*, p. 13).

Generally, under the treating physician rule, a hearing officer owes "deference to the medical opinion of a claimant's treating physician." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the

treating source opinion controlling weight." *Id*. Thus, "the Commissioner retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician where that conclusion is supported by sufficient contradictory evidence." *Cohen v. Comm'r. of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) (noting that an opinion from a claimant's treating physician is "not absolute"). And, while the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," *Selian*, 708 F.3d at 419, an opinion from a consultative medical examiner may nonetheless constitute substantial evidence, *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (per curiam)).

Upon review of the record, the Court finds that the ALJ did not err in concluding that Dr. Elwell and NP Surman's Medical Source Statement (R. 505–06) conflicted with other medical evidence in the record. The ALJ explicitly addressed their highly restrictive assessment and assigned it "little evidentiary weight because it [was] not consistent with the evidence as a whole." (R. 20). Specifically, the ALJ found that their conclusions were contrary to Plaintiff's reported activities of daily living, Dr. Magurno's consultative examination, as well as Plaintiff's treating records. (*Id*.). The ALJ noted that while MRI results showed disc herniation, stenosis, and other degenerative changes, physical examinations frequently found that Plaintiff had normal gait, needed no help changing, had only "somewhat limited range of motion of her lumbar spine and hips," "retained full range of motion of her knees and ankles," and "had no sensory or strength deficits in her lower extremities." (R. 18). The ALJ also found the providers' repeated recommendation that Plaintiff swim and exercise regularly was inconsistent with the Medical Source Statement—which "suggests that [Plaintiff] is essentially bedridden, which she is not." (R. 20). According to the ALJ's analysis, the evidence "suggest[s] that the

18

claimant is able to stand and/or walk at least two hours in an eight-hour day and perform postural activities," and therefore "[Plaintiff] retains the ability to meet the exertional demands of at least sedentary work on a sustained basis."  (R. 18, 20).

The ALJ's decision makes clear that he considered the opinions of Plaintiff's treating physicians, but discounted them because they contradicted other medical evidence and Plaintiff's activities of daily living.[2]  Although Plaintiff regularly reported pain and discomfort from her back condition, "disability requires more than the mere inability to work without pain."  *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983)).  Indeed, "[t]o be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any gainful employment."  *Id*. Thus, merely pointing to evidence that Plaintiff experienced pain as a result of her conditions is insufficient to establish disability, especially where Plaintiff's subjective complaints of pain varied significantly over time.  (*See* R. 357, 368, 373, 377, 390, 404, 444, 508, 537).  Notably, Plaintiff generally reported that her pain level was somewhere between two and four out of ten. (*See* R. 357, 363, 390, 404).  Plaintiff reported to Dr. Magurno that her pain "is better [when] she sits and rests," (R. 426), which is consistent with the ALJ's RFC for sedentary work. Accordingly, the ALJ did not violate the treating physician rule because his RFC determination was supported by substantial evidence, including Dr. Magurno's opinion, the clinical findings during that consultative examination, Plaintiff's treatment history, and her activities of daily living.

---

[2] The Commissioner's regulations expressly identify "daily activities" as one factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i); *see also Rusin v. Berryhill*, 726 F. App'x 837, 840 (2d Cir. 2018) (severe limitations claimed by the plaintiff were inconsistent with the plaintiff's report that he "cooked simple meals daily, left the house daily, can drive, and shopped for groceries every two weeks").  Thus, the ALJ's consideration of Plaintiff's activities of daily living was proper.

While Plaintiff may disagree with the ALJ's findings, the record shows factual support for each one, and the ALJ had discretion to resolve conflicts in the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."); *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 497 (S.D.N.Y. 2018) (noting that ALJ has authority "to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living") (citing *Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014)). In sum, the Court finds that the ALJ sufficiently accounted for Plaintiff's physical limitations and developed a well-supported RFC based on substantial evidence.

## IV. CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:  September 6, 2019
          Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge